UNITED STATES
v.
SPRINGFIELD FIRE & MARINE
INS. CO.
No. 14774.

United States Court of Appeals,
Eighth Circuit.

Nov. 17, 1953.

Morton Hollander, Atty., Dept. of Justice, Washington, D. C. (Warren E. Burger, Asst. Atty. Gen., Sam M. Wear, U. S. Atty., Hugh A. Miner, Asst. U. S. Atty., Kansas City, Mo., and Paul A. Sweeney and George F. Foley, Attys., Dept. of Justice, Washington, D. C., on the brief), for appellant.

Henry Depping, Kansas City, Mo. (William S. Hogsett, Joseph R. Hogsett, and Hogsett, Depping, Houts & James, Kansas City, Mo., on the brief), for appellee.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The United States sued the Springfield Fire & Marine Insurance Company to recover on a policy of fire insurance. The court, on a trial without a jury, gave judgment for the defendant, and the Government has appealed. The contract liability of the insurer is controlled by Missouri law.

The policy was one covering both real and personal property, issued to William Robbins and Virginia Robbins as insureds, and containing a union mortgage clause in favor of The First National Bank of St. Joseph, Missouri, or assigns, as mortgagee.

The recovery sought was for some corn, destroyed by fire, on which the Commodity Credit Corporation, 15 U.S. C.A. § 714 et seq., held a mortgage, under a loan made to William Robbins, pursuant to the 1948 Corn Loan and Purchase Agreement Program (13 F.R. 5417). The corn was in storage, under seal, on the insured's premises, at the time of its destruction.

Other property of the insured, including buildings, implements and animal feed, not mortgaged, also was destroyed by the fire. The insured made claim upon the policy for the amount of this loss, and it was duly paid by the insurer. He did not make claim for the destruction of the mortgaged corn, because he regarded it as not being within the coverage of the policy.

Two theories were relied upon by the Government to sustain its right to recover for the mortgaged corn. Its first contention was that Commodity Credit Corporation (CCC) was directly insured by the union mortgage clause, in that the corn loan had been made to Robbins by The First National Bank of St. Joseph, Missouri, as an approved lending agency of CCC (6 CFR § 606.3); that CCC had thereafter purchased Robbins' note and mortgage from the Bank (6 CFR § 606.22); and that CCC had there-

by succeeded as "assigns" to the interest of the Bank under the mortgage-clause coverage.

The second contention of the Government was that, irrespective of the mortgage-clause coverage, it also was entitled to recover on the basis of Robbins' personal coverage, by virtue of the following regulation promulgated by CCC in connection with the 1948 Corn Loan and Purchase Agreement Program: "CCC will not require the producer to insure the corn placed under loan; however, if the producer does insure such corn such insurance shall inure to the benefit of CCC to the extent of its interest, after first satisfying the producer's equity in the corn involved in the loss." 6 CFR § 606.16. Another section of the regulations (Id., § 606.17) provided that "uninsured physical loss or damage occurring without fault, negligence, or conversion on the part of the producer, resulting solely from an external cause other than insect infestation or vermin will be assumed by CCC * * *."

The primary difficulty confronting the Government here, on both of its theories of recovery, is that one of the grounds on which the court predicated its denial of relief was a finding, in effect, that, from the contracting situation, intention and construction shown by the evidence, the mortgaged corn was entitled to be regarded as not being insured by the policy, either as a matter of mortgage-clause coverage or as a matter of personal coverage to Robbins.

■ In respect to the mortgage-clause coverage, the testimony both of Robbins and of an officer of The First National Bank of St. Joseph, Missouri, showed unequivocally that the mortgage-clause endorsement had been required by the Bank and attached to the policy solely in relation to a real estate loan which the Bank had made to Robbins and which Robbins had subsequently paid. The Bank held the policy as part of its collateral, while the real estate loan was in effect, and upon payment of the obligation it surrendered the policy to Rob-

bins. All of this occurred before the corn loan was taken out and without any relationship to that loan.

The only agreement shown to have existed between Robbins and the Bank for insurance coverage in favor of the Bank was as to the real estate loan. Neither of them had intended the mortgage clause to constitute an open insurance coverage in favor of the Bank.[1] The Bank recognized the rights created in its favor by the mortgage clause as having terminated when its real estate loan was paid, as both its actions at the time and the testimony of its vice-president on the stand clearly indicated. And it made no request that Robbins provide it with insurance coverage in connection with the corn loan, not because it regarded the previous mortgage-clause endorsement as having any application thereto, but because of the lack of any need for such protection in its favor under the provisions of the CCC regulations, which have been quoted above, and under the provisions of its Lending Agency Agreement.

In these circumstances of contracting situation, existing intention, and admitted construction between Robbins and the Bank, the Bank clearly would not have been in a position to have claimed a mortgage-clause loss in the destruction of the corn, if it had continued to hold the corn-loan papers and had chosen not to sell them to CCC. And necessarily also, it would be impossible for CCC to claim any mortgage-clause coverage by succession from the Bank, when the Bank itself had nothing that could provide the basis for a succession.[2]

In respect to the coverage in favor of Robbins, the language of the $6,000 grain-clause did not directly indicate whether it was intended to constitute a fixed or a shifting risk. So far as the language alone was concerned, it would have been capable of being either. Robbins testified, however, that the insurance was meant to cover only the grain which he at that time had on hand and not any grain that might be subsequently produced. The corn here involved was raised and harvested the year after the policy went into effect. While the policy had been taken out for a three-year term, Robbins further testified that on the date the contract became effective he had on hand approximately $100,000 worth of grain, some of which he of course expected to use for feeding purposes, but that he would "have some cribs for three or more years."

It is to be remembered that the Government's second theory of recovery rests wholly upon Robbins' rights under the policy and not upon any independent right of its own. The CCC regulation, on which the Government relies, could in no event be said, as against the insurer, no matter what grain might be covered by the policy, to have effected any assignment or switching of grain coverage as such from Robbins' ownership interest to CCC's mortgage interest, in view of the express provision of the policy that "Assignment of this policy shall not be valid except with the written consent of this Company." Chapman v. McIlwrath, 77 Mo. 38, 46 Am.Rep. 1; Ocean Accident & Guar. Corp. v. Southwestern Bell Tel. Co., 8 Cir., 100 F.2d 441, 444, 122 A.L.R. 133. The most, therefore, that the regulation could be claimed to do was to entitle CCC, as between itself and Robbins, to have the loss proceeds, if any, for which the insurer could be said to be obligated under the policy to Robbins for a destruction of the mortgaged corn, "inure to the benefit of CCC to the extent of its interest, after first satisfying the producer's equity in the corn."

1. We do not, of course, mean to imply that an intention on the part of a mortgagor and a mortgagee alone, that a union mortgage clause attached to a fire policy should constitute an open coverage in favor of the mortgagee, would be sufficient to make the insurer's obligation of that nature or scope.

2. Whether such a succession might otherwise have automatically occurred under the policy, if mortgage-clause coverage had existed, we need not consider.

Whether this legally amounted to an assignment from the insured to the mortgagee of the right to all such proceeds as the insured would be entitled to recover under the policy for a destruction of the corn, with a consequent vesting of ownership to any such clause of action in the mortgagee, or whether it merely created in CCC a beneficial interest in any such proceeds as the insured would have a right to recover, with the necessity of making the insured a party to any suit brought by the mortgagee to establish and enforce such beneficial interest against the insurer, we need not determine. In either situation, there would be nothing for which CCC or the Government could sue, either on the basis of ownership or of beneficial interest, if the contract of insurance had not created any coverage right in favor of Robbins as to the mortgaged corn.

■ It is of course the rule, both in Missouri and generally, that, except where the language of a contract is as a matter of law required to be given a certain meaning or scope, the parties are entitled, consistent with the language which they have used, to have their agreement read on the basis of what they themselves in fact intended, understood or have recognized its meaning and scope to be. Ellis v. Harrison, 104 Mo. 270, 16 S.W. 198; North St. Louis Building & Loan Ass'n v. Obert, 169 Mo. 507, 69 S.W. 1044; P. R. T. Inv. Corp. v. Ranft, Mo.Sup., 252 S.W.2d 315; Order of United Commercial Travelers v. Sevier, 8 Cir., 121 F.2d 650, 654; Hawkeye Cas. Co. v. Rose, 8 Cir., 181 F.2d 157.

We think that the evidence here was sufficient to support the finding, which the trial court in effect made, that the $6,000 grain-coverage of the policy was intended, understood and recognized by the insured and the insurer as being applicable only to the $100,000 accumulation of grain which Robbins had on hand at the time the policy became effective, of which accumulation the insured apparently anticipated that a part at least would remain on hand throughout the term of the policy, and that it thus did not extend to any grain, including the mortgaged corn, which should subsequently be produced.

The fact that not only had the subsequently produced corn here involved been placed under CCC loan and storage, but that Robbins had had the loan extended and the corn resealed for a second year, and that toward the expiration of this period he had given notice to CCC of his desire to turn over the corn in satisfaction of the loan was, at least in some measure, indicative of his having had an ample supply of other grain and of why the parties naturally could be said to have dealt in relation to that situation.

Again, beyond the matter of the situation existing at the time of the contracting and of Robbins' testimony as to what the contractual intention had been, the court was entitled to note that the mutual recognition which the parties had given to this intention and understanding in relation to the occurring fire was not merely a matter of loss disposition but equally was definitive of the rights which existed under the policy for the term thereof that still remained.

■ All of this together seems to us to have afforded an ample basis for the trial court to become convinced and to conclude that the intention and understanding of the parties, in the making and as to the operation of the contract, had been that the coverage on grain for which the policy provided had application only to the $100,000 worth of grain which Robbins had on hand at the time and not to any grain which might subsequently be produced. That the court might perhaps equally reasonably have reached an opposite conclusion, or that we might possibly have done so had we been the trier of the facts, does not entitle us to reverse. In this connection, it should be added that no fraud or collusion on the part of the insured and the insurer to prevent a recovery on behalf of CCC is suggested, nor in the light of the trial court's appraisal could any be said to be involved.

The trial court rested its denial of recovery on other grounds also, which the Government contends are unsound, but the basis on which the judgment is being affirmed, as discussed above, makes unnecessary any consideration of these contentions.

Affirmed.