**DRAKE AND BEEMONT MUTUAL AID SOCIETY AGAINST FIRE AND LIGHTNING, An Unincorporated Association, Appellant,**

v.

**UNITED STATES of America, Appellee.**

No. 17412.

United States Court of Appeals
Eighth Circuit.

April 14, 1964.

---

1. Woodson v. Chamberlain, 4 Cir., 317 F.2d 245.

Martin Schiff, Jr., St. Louis, Mo., made argument for appellant and filed brief with William J. Tate, of Husch, Eppenberger, Donohue, Elson & Cornfeld, St. Louis, Mo., and Randolph E. Puchta, Hermann, Mo.

J. F. Bishop, Atty., Dept. of Justice, Washington, D. C., made argument for appellee and filed brief with John W. Douglas, Asst. Atty. Gen., Morton Hollander, Atty., Dept. of Justice, Washington, D. C., and Richard D. FitzGibbon, Jr., U. S. Atty., St. Louis, Mo.

Before VOGEL, MATTHES and BLACKMUN, Circuit Judges.

VOGEL, Circuit Judge.

Defendant-appellant, Drake and Beemont Mutual Aid Society Against Fire and Lightning, is an unincorporated association composed generally of farmers living in Gasconade County, Missouri, and having a membership of approximately 900. On December 18, 1957, Russell Rhoads and his brother, Charles Rhoads, became members of the appellant society which thereupon insured against loss by fire or lightning up to two-thirds of the value of specified farm property and equipment belonging to them, including corn and other grains stored on the premises. There was no actual individually written insurance policy in the accepted sense. The society furnished each of its members with a list of property which was to be covered un-

der its insurance program, together with a copy of the society's statutes and by-laws having provisions concerning insurance coverage which were binding upon all parties in interest.

On February 7, 1958, Russell Rhoads, the owner of 10,792 bushels of shelled corn which was stored on the Rhoads farm, obtained a government loan on the corn from the Commodity Credit Corporation and delivered to it his note for $14,354.53, together with a loan agreement and chattel mortgage. The note could be satisfied by delivery of the corn or payment in cash. Under the regulations incorporated in the terms of the loan agreement, the Commodity Credit Corporation did not require a grain producer or borrower thereon to insure the grain but if he did so, the proceeds of such insurance were to inure to the Commodity Credit Corporation's benefit to the extent of its interest. In the event of no insurance, the Commodity Credit Corporation assumed risk of physical loss of the grain on which the loan had been obtained. Upon the mortgaging of the corn, notices or seals were affixed to the doors of the bins stating that the corn had been mortgaged to secure a loan under a program of the Commodity Credit Corporation and that entry was restricted to persons authorized by the Department of Agriculture. The corn at all times remained on the Rhoads farm.

On February 10, 1958, a fire destroyed various farm property and equipment on the Rhoads farm, including the 10,792 bushels of shelled corn on which the Commodity Credit Corporation had loaned to Russell Rhoads $14,354.53. Admittedly, the value of the mortgaged corn on the date of the fire was $11,602.35. The appellant society listed and appraised the burned property, other than the shelled corn, at $13,362. Such list included 1200 bushels of non-mortgaged corn owned by Charles E. and Russell Rhoads.

On April 8, 1958, the appellant society issued its check in the amount of $13,337 (salvage of $25 was deducted from the total) payable to Charles E. and Russell Rhoads covering "damage by fire on February 10th, 1958". It was understood by Rhoads and the appellant society that the check was in payment of insurance on property other than the mortgaged corn.

On April 9, 1958, Russell Rhoads executed an assignment to the Commodity Credit Corporation of his claim against the appellant society for the insurance proceeds on the mortgaged corn. The assignment conveyed to Commodity Credit Corporation all of Rhoads' right, title and interest in the "proceeds" payable under the insurance "to the extent that such proceeds were paid or payable on the commodity under loan".

Following the assignment, the United States made claim on the appellant society for the payment of $7,738.27 representing two-thirds of the value of the 10,792 bushels of shelled corn that was destroyed. Upon appellant's refusal to make payment, this suit resulted. The parties waived a jury and the case was tried to the court. In findings and opinion published at 218 F.Supp. 155, the District Court, Judge John K. Regan, found against the society in each of its contentions: (1) That there could be no assignment under the by-laws and listings of the society; (2) that the plaintiff, the United States, by the terms of its mortgage, held the insured harmless in the event of a fire which destroyed the corn and thus no loss was suffered by the insured; and (3) that by cashing the check issued by the society prior to the execution of the assignment, the insured thereby released the defendant from all liability. In answer to these contentions, Judge Regan held that while the membership could not be assigned, the right to recovery of the loss could; that the provisions of the contract between Commodity Credit Corporation and the grain owner holding the owner harmless in the event of loss by fire could not inure to the benefit of appellant society; and that with reference to the cashing of the check by the Rhoads, which check was issued by the appellant society, the release was invalid and at least constituted

a mutual mistake between the parties as to the extent of the insurance coverage.

In appealing to this court, the society claims two errors:

"I.

"The Court erred in allowing the plaintiff, and assignee, to recover under the terms of an insurance policy issued by defendant, because the evidence clearly established that no insurance coverage existed at the time of the loss, with respect to the commodity upon which plaintiff's claim of loss was founded."

"II.

"The Court erred in holding invalid, on the ground that there had been a mutual mistake as to the extent of insurance coverage, a release executed to defendant by plaintiff's assignor, because a valid and binding accord and satisfaction had been reached between defendant and plaintiff's assignor prior to any assignment to plaintiff; and any mistake that may have been made was one of law and not one of fact, a mistake for which the courts will not grant relief."

■ With reference to the appellant's first point, it is conceded that when Russell Rhoads and his brother became members of the society on December 18, 1957, the corn, which was subsequently mortgaged to CCC, was insured by virtue of Section 7 of the society's statutes and by-laws which, inter alia, specifically included corn. It is the society's contention, however, that by securing a Commodity Credit Corporation loan on February 7, 1958, Rhoads forfeited the insurance carried with the society. It points out that under Section 12 of its statutes and by-laws there is provided:

"Section 12.

"No building or other property will be insured in this society which is insured against fire and lightning in any other company. Any member violating the above rule, will forfeit all benefits from this society. Such property, however, may be listed and appraised by the appraisers, but the insurance will go into effect only after the expiration of the policies of the companies in which the property was insured during the time of the above mentioned listing and appraising."

Appellant claims that the Commodity Credit Corporation became an insurer of the property and that, accordingly, Rhoads would be barred from asserting any claim against the society under its policy of insurance. We do not believe that the mortgage given by Rhoads to the Commodity Credit Corporation can be so construed. By agreeing not to hold the borrower, Rhoads, for the amount of his note and interest in the event of destruction of the mortgaged corn without fault on the part of Rhoads the government did not thereby become an insurer against loss. In the event of total destruction, Rhoads' loss may have been less or more than the amount of his note and mortgage. He was merely relieved of the obligation to pay his note or deliver the property mortgaged as security therefor. This was not insurance " * * * against fire and lightning in any other company" within the purview of Section 12. Such section was pointedly for the purpose of preventing the carrying of duplicate insurance and the collection of double losses. Additionally, as pointed out supra, the borrower was not required to carry insurance upon the grain on which a loan was obtained but in the event insurance was so carried, payments therefrom were to inure to Commodity Credit Corporation's benefit to the extent of its interest.

■ The society also points out that by Section 22 of its statutes and by-laws it was not required to pay if it could be established that Rhoads was not the legitimate owner of the property involved. It argues:

" * * * And, if matters would have progressed according to the

general practice prevailing in Gasconade County, the Commodity Credit Corporation would have wound up as *purchaser* of the corn, for the general rule was that corn mortgaged in the Government was never redeemed by the farmer but was taken over by the Government. In this connection it appears extremely unlikely that Rhoads would ever have redeemed his corn for $14,354.53, when the appraised market value of the corn as of the date of the fire loss was only $11,602.35. All in all, it should be said that there were more *ownership* rights in the Commodity Credit Corporation than in Rhoads as of the date of the fire loss."

But in no sense did the government, through its Commodity Credit Corporation, become the owner of the corn involved. The corn was stored on the insured's farm and the insured was in possession, albeit the bins were sealed and notice of mortgage to Commodity Credit Corporation was posted. The "Producer's Note and Supplemental Loan Agreement" executed by Russell Rhoads clearly indicates that the transaction with the Commodity Credit Corporation was nothing more or less than a loan secured by a mortgage with the provision that should the borrower decide at any time to turn in the corn instead of repaying the loan, he could do so. Obviously he would do so if the market value of the corn was less than the amount loaned thereon by the government. It could well have been the other way around. Clearly, Rhoads was still the owner of the corn.

■ If the society had desired to extend no coverage to property mortgaged without its consent, it could very easily have so provided. It did not do so. A form for specific exclusion of property mortgaged without the consent of the insurance company is in common use and could have been inserted in the statutes and by-laws of the society. In contrast and direct conflict with the society's presently expressed intention is the form employed by it for the listing of insured property, which form fully recognizes that a mortgagor continues to be the "property holder" and also affords the insured the option of directing payment to the "mortgagee" and there is appended to the form a blank for such purpose, reading as follows:

"In Case of Loss To: . . . . . . . . . . . . . .

Mortgagee"

Certainly under the circumstances the court should not be asked to write into the insurance contract provisions not therein found and which would restrict coverage substantially below the ordinary and common understanding given to the contract which did exist. Appellant's attempt to vary the terms of the contract between the parties through the use of parole evidence must, of course, fail. National Surety Corp. v. Curators of University of Mo., 8 Cir., 1959, 268 F.2d 525, 528; Frimel v. Blake, Mo.App. 1962, 360 S.W.2d 258, 261; Fisher v. Miceli, Mo.1956, 291 S.W.2d 845, 848; Commerce Trust Co. v. Watts, 1950, 360 Mo. 971, 977, 231 S.W.2d 817, 820.

Appellant society places great reliance on a case from this court, United States v. Springfield Fire & Marine Ins. Co., 8 Cir., 1953, 207 F.2d 935. The facts in that case so distinguish it from the instant one as to allow the drawing of no parallels resolving the issues. In that case, at the time the insurance was written the grain in question had not as yet been produced. The grain involved was raised and harvested the year after the policy went into effect, and the owner of the grain had given notice to CCC of his desire to turn the corn over in satisfaction of his loan. The insurance contract was not clear as to whether it covered after-acquired property. In other words, an ambiguity existed justifying resort to evidence as to the intention of the parties. We said there 207 F.2d at page 938:

"We think that the evidence here was sufficient to support the finding, which the trial court in effect made, that the $6,000 grain-coverage of the

policy was intended, understood and recognized by the insured and the insurer as being applicable only to the $100,000 accumulation of grain which Robbins had on hand at the time the policy became effective, of which accumulation the insured apparently anticipated that a part at least would remain on hand throughout the term of the policy, and that it thus did not extend to any grain, including the mortgaged corn, which should subsequently be produced.

"The fact that not only had the subsequently produced corn here involved been placed under CCC loan and storage, but that Robbins had had the loan extended and the corn resealed for a second year, and that toward the expiration of this period he had given notice to CCC of his desire to turn over the corn in satisfaction of the loan was, at least in some measure, indicative of his having had an ample supply of other grain and of why the parties naturally could be said to have dealt in relation to that situation.

\* \* \* \* \* \*

" \* \* \* That the court might perhaps equally reasonably have reached an opposite conclusion, or that we might possibly have done so had we been the trier of the facts, does not entitle us to reverse."

■ In the instant case, no ambiguity exists. It is conceded, and rightly so, that when the Rhoads brothers became members of the appellant society on December 18, 1957, this corn was in existence and was in storage on the Rhoads farm and it was covered by the provisions of the insurance policy. If the insurance protection was ever removed from the corn, it could only have been because of the CCC loan made by Russell Rhoads on February 7, 1958. Yet nothing in the insurance contract between the parties excludes coverage upon the placing of a mortgage on the insured property. In fact, as we have already pointed out, the statutes and by-laws of the appellant society clearly indicate that the mortgaging of covered property was in contemplation between the parties.

■■ Appellant's second contention is that Rhoads' endorsement of the society's check covering the destruction of property other than the mortgaged corn consummated a valid accord and satisfaction between the parties. The contention cannot be sustained. A release, of course, is to be restricted to the claim which was within the contemplation of the parties. 45 Am.Jur., Release, § 51, p. 710:

"Courts of equity will restrict a general release to the thing or things intended to be released. As on a release of all demands, when some particular demand was in view, the court of chancery will not allow the releasee to take advantage of the general words to defeat the collection of a demand not then in the minds of the parties. So, too, a court of equity will reform contracts in all cases, on a proper showing that they were so drawn as not to express the intention of the parties, \* \* \*."

Butcher v. United Electric Coal Co., 7 Cir., 1949, 174 F.2d 1003; United States v. Ramstad Construction Co., D.C.Alaska 1961, 194 F.Supp. 379, 381; Williams v. Riley, Mo.App.1951, 243 S.W.2d 122, 124; Kopp v. Traders Gate City Nat. Bank, 1948, 357 Mo. 659, 210 S.W.2d 49, 53; Wilson & Co. v. Hartford Fire Ins. Co., 1923, 300 Mo. 1, 254 S.W. 266, 279.

Rhoads' assignment of his insurance claim for destruction of the mortgaged corn to Commodity Credit Corporation is substantial evidence that he had no intention of releasing the appellant society therefor when he endorsed the society's check covering loss of the other non-mortgaged property. Furthermore, Exhibit No. 7 itemizes the properties covered by the payment made to the Rhoads brothers. It includes the 1200 bushels of unmortgaged corn plus many other items but does not include the corn mortgaged to the Commodity Credit Corporation. The District Court's finding that there was a mutual mistake

**554**

between the parties and that the release did not cover the destroyed corn is amply supported in the record. Cf. United States v. Home Ins. Co. of N. Y., D.C. S.D.Ill., 1956, 142 F.Supp. 478.

Judgment for the United States is affirmed.